**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In Re Application of

EAD Group LLC,

         *Applicant*,

To Obtain Discovery for Use in an
International Proceeding.

Misc. Action No. 25-

**MEMORANDUM OF LAW IN SUPPORT OF**
***EX PARTE* APPLICATION FOR AN ORDER UNDER 28 U.S.C. § 1782**
**<u>TO OBTAIN DISCOVERY FOR USE IN AN INTERNATIONAL PROCEEDING</u>**

**VENABLE LLP**

Kostas D. Katsiris
Benjamin S. Paull
151 West 42nd Street
New York, New York 10036
(212) 370-6272
(212) 218-2319
kdkatsiris@venable.com
bspaull@venable.com

*Counsel for Applicant EAD Group LLC*

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 3

    I.    NATURE OF THE DISPUTE ................................................................................ 3

        A.    The Lending Agreement ........................................................................... 4

        B.    The Funding of the Collateral Account and the Collateral Calls ........................................................................................................... 5

        C.    The Liquidation Scheme Unravels and Toros Goes Dark ........................ 5

        D.    Rezk Attempts to Get Information about the Collateral Shares ...................................................................................................... 6

    II.    THE SWISS ACTION ........................................................................................... 7

    III.    THE REQUESTED DISCOVERY ....................................................................... 9

ARGUMENT ..................................................................................................................... 11

    I.    THE APPLICATION SHOULD BE GRANTED BECAUSE IT SATISFIES ALL OF THE STATUTORY REQUIREMENTS OF SECTION 1782 ................................................................................................ 122

    II.    DISCRETIONARY CONSIDERATIONS WEIGH HEAVILY IN FAVOR OF GRANTING THE APPLICATION .................................................. 16

    III.    THE APPLICATION SHOULD BE GRANTED ON AN *EX PARTE* BASIS ...................................................................................... 20

CONCLUSION .................................................................................................................. 21

CERTIFICATE OF COMPLIANCE ................................................................................. 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                      **Page(s)**

*In re Accent Delight Int'l Ltd.*,
    869 F.3d 121 (2d Cir. 2017) ............................................................................14, 15

*Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*,
    785 F. Supp. 2d 434 (S.D.N.Y. 2011) ........................................................................17

*In re Application of Evenstar Master Fund SPC*,
    No. 20-mc-418 (CS) (JCM), 2021 WL 5498283 (S.D.N.Y. Nov. 23, 2021) .........................16

*In re Application of Imanagement Servs. Ltd.*,
    No. Civ.A 05-2311 (JAG), 2006 WL 547949, at *4 (D.N.J. Mar. 3, 2006) ..........................18

*In re Aso*,
    No. 19-mc-190 (JGK) (JLC), 2019 WL 2345443 (S.D.N.Y. Jun. 3, 2019) .....................13, 19

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
    673 F.3d 76 (2d Cir. 2012) ................................................................................12, 14, 17, 19

*In re Catalyst Managerial Servs., DMCC*,
    680 F. App'x 37 (2d Cir. 2017) ....................................................................................12

*In re Esses*,
    101 F.3d 873 (2d Cir. 1996) ........................................................................................16

*Euromepa, S.A. v. R. Esmerian, Inc.*,
    51 F.3d 1095 (2d Cir. 1995) ....................................................................................17, 18

*Gushlak v. Gushlak*,
    486 F. App'x 215 (2d Cir. 2012) ..................................................................................20

*In re Hornbeam*,
    722 F. App'x 7 (2d Cir. 2018) ......................................................................................20

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004) ............................................................................................*passim*

*In re Kingstown Partners Master Ltd.*,
    No. 21-mc-691 (LTS), 2022 WL 1081333 (S.D.N.Y. Apr. 8, 2022) .....................................14

*Mees v. Buiter*,
    793 F.3d 291 (2d. Cir. 2015) ....................................................................................15, 19

*In re Mutabagani*,
    No. 22-mc-299 (VB), 2023 WL 2811621 (S.D.N.Y. Apr. 6, 2023) .....................................16

*In re Nike Shipholding Corp.*,
    No. 23-mc-221 (ALC) (KHP), 2023 WL 5917196 (S.D.N.Y. Jul. 31, 2023) ........................14

*In re O'Keeffe*,
    650 F. App'x 83 (2d Cir. 2016) ........................................................................................20

*In re Rodriguez Gallen*,
    No. 20-mc-102 (ALC), 2020 WL 114683 (S.D.N.Y. Jun. 29, 2020) ....................................20

*In re Servicio Pan Americano de Proteccion*,
    354 F. Supp.2d 269 (S.D.N.Y. Dec. 6, 2004) ........................................................................18

*In re Top Matrix Holdings Ltd.*,
    No. 18-mc-465 (ER), 2020 WL 248716 (S.D.N.Y. Jan. 16, 2020) .........................................14

*In re Tuohy*,
    No. 24-mc-605 (GHW) (OTW), 2025 WL 1147574 (S.D.N.Y. Apr. 18, 2025) ....................20

*In re W. Afr. Min. Trading Ltd.*,
    No. 24-mc-114 (DEH), 2024 WL 3862293 (S.D.N.Y. Aug. 19, 2024)...................................13

Applicant EAD Group LLC ("EAD") submits this memorandum of law in support of its application for an Order under 28 U.S.C. § 1782 ("Section 1782") to obtain discovery from (i) Credit Suisse Securities (USA) LLC ("Credit Suisse USA"), (ii) Brown Brothers Harriman & Co. ("BBH"), and (iii) Citibank, N.A. ("Citibank," and collectively with Credit Suisse USA and BBH, the "Custodians"), for use in a pending Swiss civil litigation, captioned *EAD Group LLC v. W Management Services Ltd.*, Zurich District Court Case No. EQ250244-L (the "Swiss Action"). This application (the "Application") is further supported by the declarations of Konstantinos D. Katsiris (the "Katsiris Declaration" or "Katsiris Decl.") and Mina Attalla Rezk (the "Rezk Declaration" or "Rezk Decl."), and the exhibits annexed thereto, filed concurrently with this application.

## INTRODUCTION

This Application is part of a global effort to rectify the fraudulent dissipation of tens of millions of dollars' worth of stock in Aeva Technologies, Inc. ("Aeva"), which belonged to the company's President, Chief Technical Officer, and Chairman, Mina Rezk ("Rezk"). Rezk has suffered substantial losses as a result of this brazen theft, and he was forced to commence an arbitration and several litigations to seek redress. This Application is a focused but important part of that effort: pursuant to Section 1782, EAD seeks targeted discovery from three U.S.-based financial institutions that were involved in transactions concerning the stock in question, for use in an ongoing Swiss civil proceeding, described below.

The Court is already familiar with the subject matter of this Application, which relates to the action commenced by EAD in the related matter captioned *EAD Group LLC v. Bulent Toros, et al.*[1] In sum, the underlying dispute relates to a loan agreement between EAD, a company owned

---

[1] Southern District of New York Civil Case No. 1:25-cv-8083 (DEH).

by Rezk, as borrower, and W Management Services, Ltd. ("WMS"), a company owned and operated by Bulent Toros ("Toros"), as lender.  EAD pledged approximately US$40 million worth of Aeva stock in exchange for a US$10 million loan.  Under the lending agreement, WMS was expressly prohibited from selling, trading, pledging, liquidating, or hedging the Aeva stock.  Despite this express prohibition, WMS sold off *all* of the pledged Aeva stock, without Rezk's knowledge or authorization, and then Toros fled the U.S. and stopped communicating with Rezk.  EAD subsequently commenced several proceedings to seek redress including, as relevant here, the Swiss Action, which is a civil attachment proceeding pending in Zurich District Court against WMS.  The Swiss Action seeks an order to freeze assets of up to approximately US$134,532,400 plus interest in several Swiss bank accounts associated with Toros.  Thus far, the Zurich District Court has granted a provisional order freezing assets in Switzerland, and additional proceedings are anticipated both before the Zurich District Court, and (once certain summary proceedings are completed before that court) in the Zurich High Court, which will act as an appellate court in the Swiss Action.

Credit Suisse, BBH, and Citibank hosted accounts where the pledged stock was traded, and/or acted as the custodians of the pledged Aeva stock.  This Application seeks documents from these Custodians, for use in the Swiss Action, relating only to the pledged Aeva stock and the accounts where that stock was custodied.  As a result, the proposed subpoenas submitted with this Application are narrowly tailored to seek account opening and closing information, trading instructions, transaction information, account statements, and communications relating only to the pledged Aeva stock.  This information is squarely relevant to the Swiss Action.  Among other things, the requested information may shed light on the precise instructions the Custodians

received from WMS, how Toros and WMS characterized EAD's rights with respect to the pledged Aeva stock, and the identity of the recipients of the liquidated Aeva stock.

Critically, EAD must obtain the information sought in this Application prior to the conclusion of an appeal in the Swiss Action. EAD cannot control the timing of an appellate proceeding in the Swiss Action. As a result, EAD must take steps now to make this Application and, if it is granted, issue the subpoenas to the Custodians, negotiate an appropriate production of responsive documents, and review and process those documents, in order to be in a position to submit them to the Zurich High Court in a timely fashion.

As the information sought is relevant to the Swiss Action and would be received by the Zurich High Court if submitted in a timely fashion, this Application satisfies each of the statutory requirements of Section 1782, as well as the discretionary factors that bear on a Section 1782 application. For these reasons, amplified below, EAD respectfully submits requests that the Court grant the Application as soon as practicable.

## STATEMENT OF FACTS

### I.    NATURE OF THE DISPUTE

The international proceeding underlying this Application is the Swiss Action. The dispute in the Swiss Action relates to a 2022 lending agreement (the "Lending Agreement") between EAD, a company owned and operated by Rezk, as borrower, and WMS, a company owned and operated by Toros, as lender. *See* Katsiris Decl. ¶ 6, Ex. 5 ¶ 2; *see also* Rezk Decl. ¶ 8. As described further *infra* at 5-6, WMS flagrantly breached the Lending Agreement by liquidating all of Rezk's pledged Aeva stock. Katsiris Decl., Ex. 5 ¶¶ 7, 99. Subsequently, EAD commenced the Swiss Action against WMS. Katsiris Decl. ¶ 5.

In the Swiss Action, EAD is seeking an order attaching (or freezing) assets of up to approximately US$134,532,400 plus interest in several Swiss bank accounts belonging to WMS

to secure EAD's claims for compensatory damages.  Katsiris Decl. ¶ 7, Ex. 5 ¶¶ 10-11, 136.  The
two grounds supporting EAD's attachment application in the Swiss Action are described *infra* at
7-8.

Much of the information concerning the wrongful liquidation of the pledged Aeva shares,
which is not yet available to Rezk or EAD, is in the possession of Credit Suisse USA, BBH, and
Citibank, as these financial institutions were involved in transactions concerning those shares.  The
documents requested from the Custodians in this Application are specified in Annex. 1 to each of
the subpoenas attached as Exhibits 2-4 to the Katsiris Declaration (the "Subpoenas").  As explained
further below, the documents requested from the Custodians in the Subpoenas are needed for EAD
to effectively prosecute its claims in the Swiss Action.

### A.    The Lending Agreement

In June 2022, EAD and WMS entered into the Lending Agreement.  Rezk Decl. ¶ 8.  Under
the Lending Agreement, EAD borrowed US$10 million in exchange for an initial pledge of Aeva
shares (the "Collateral Shares"), valued at approximately US$40 million at the time the Lending
Agreement was executed.  *See id.* ¶ 9, Ex. 1 (MLA Term Sheet) at 1.

A critical term of the Lending Agreement, which Rezk specifically bargained for, was that
the lender was expressly prohibited from "loan[ing], pledg[ing], or re-pledg[ing]," selling or
trading, or "engag[ing] in any hedging activities" with respect to the Collateral Shares.  *See* Rezk
Decl. ¶ 9, n. 2, Ex. 1 § 5(e) (the "Pledge Prohibition").  The Lending Agreement also provided that
the Collateral Shares would be held in a segregated account for the benefit of EAD and under
EAD's custodial ownership.  *Id.* (MLA Term Sheet) at 1 (the "Collateral Account").  The Lending
Agreement also provided that if the trading price of Aeva stock fell below 60% of the trading price

at the time of execution of the Lending Agreement, the lender was permitted to demand additional Collateral Shares to secure the loan (the "Collateral Call"). *Id.* at 3-4; *see also* Rezk Decl. ¶ 9.

### B.    The Funding of the Collateral Account and the Collateral Calls

After the execution of the Lending Agreement, WMS's representative confirmed that the Collateral Account would be opened at Credit Suisse, custodied in the U.S., and held in a segregated account established in the name of EAD. Rezk Decl. ¶ 10. Rezk promptly transferred 2.4 million Aeva shares (then valued at approximately US$40 million) into the Collateral Account. Rezk Decl. ¶ 14. BBH received the Collateral Shares as the U.S. custodian. *See id.* ¶ 15; Ex. 6.

In September 2022, Aeva's share price plummeted, triggering WMS's right to demand additional Collateral Shares under the Lending Agreement. Rezk Decl. ¶ 21. In the same month, WMS issued a Collateral Call. *Id.* Rezk promptly complied by transferring 460,000 additional Aeva shares to BBH at the Collateral Account. *Id.* ¶ 22.

After the September 2022 Collateral Call, Aeva's share price continued to fall. In April 2023, Rezk received another Collateral Call request from Toros, who requested an additional pledge of 700,000 Aeva shares. *See id.* ¶ 24. Rezk disputed his obligation to pledge additional Collateral Shares, and in response, EAD and WMS entered into a Letter Agreement dated May 1, 2023 (the "Top-Up Addendum"). *Id.* ¶ 25. Under the Top-Up Addendum, EAD agreed to pledge 700,000 additional Aeva shares as collateral, and in return, WMS agreed to return those shares to EAD if the Aeva share price rose above a specified threshold. *Id.* After the execution of the Top-Up Addendum, Rezk transferred 700,000 Aeva shares to a Citibank account. *Id.* ¶ 26.

### C.    The Liquidation Scheme Unravels and Toros Goes Dark

In early 2025, Aeva's share price surged, and in May 2025, the share price exceeded the threshold specified in the Top-Up Addendum for WMS to return the 700,000 Aeva shares that

Rezk pledged in May 2023.  Rezk Decl. ¶ 28.  However, on June 3, 2025, Rezk was informed by Toros that all of the Collateral Shares were liquidated "as a result of unmet margin obligation on the part of WMS." *Id.* ¶ 29, Ex. 15.  Immediately after, Rezk and Toros had two phone calls where Toros acknowledged the wrongful dissipation of the Collateral Shares.  Rezk Decl. ¶ 30.  However, since those phone calls, Toros fled to Türkiye, evaded all of Rezk's attempts to contact him, and has failed to rectify the wrongful sale of the Collateral Shares.  *Id.* ¶¶ 31-32.

### D.    Rezk Attempts to Get Information about the Collateral Shares

After Toros failed to respond to Rezk's communications, Rezk attempted to obtain information regarding the Collateral Shares and the Collateral Account himself.  *See* Rezk Decl. ¶¶ 33-46.  During his own investigations, Rezk discovered that, shortly after the initial funding of the Collateral Account in July 2022, the Collateral Shares were liquidated from the Collateral Account without his knowledge or authorization.  *Id.* ¶¶ 40-44.

Before initiating the instant Application, Rezk attempted to obtain information about the Collateral Account and the Collateral Shares from each of Credit Suisse, BBH, and Citibank directly.  *Id.* ¶¶ 36-38.  However, Rezk's attempts to obtain documents in this manner did not bear fruit, and none of the Custodians disclosed any documents to Rezk in response to his requests for information.  *Id.*; *see also id.* ¶ 5 (Rezk does not possess any documents from the Custodians relating to the unauthorized liquidation of the Collateral Shares).

Notably, the limited information Rezk *did* receive from Credit Suisse and BBH employees contradicted the information that Rezk had previously received from Toros and WMS.  For example, a Credit Suisse employee disclosed to Rezk that the Collateral Account was closed in April 2023 (*id.*, ¶ 36), which contradicted the account statement for the Collateral Account that Rezk received in December 2024, *i.e.*, after the apparent closure of the account. *Id.* ¶ 27, Ex. 14

(December 2024 Credit Suisse Account Statement purporting to show Collateral Shares in the account). This example and others like it illustrate EAD's need for the requested discovery, because it shows that Collateral Account statements provided to Rezk were fabricated. EAD needs to examine business records from the Custodians to understand exactly what happened with the Collateral Account and the Collateral Shares and to submit such evidence in the Swiss Action.

## II.    THE SWISS ACTION

On September 11, 2025, EAD commenced the Swiss Action by filing an application for an attachment (or freezing) order in the Zurich District Court. Katsiris Decl. ¶ 5.[2] The application for an attachment order (the "Swiss Attachment Order Application") requested an order attaching (or freezing) assets belonging to WMS in bank accounts held at EFG Bank AG, UBS AG and UBS Switzerland AG, and Rothschild & Co Bank AG. *See id.*, Ex. 5, pp. 2-3 ("Prayers for Relief"). The Swiss Attachment Order Application sought to freeze assets valued up to approximately US$134,532,400 plus interest to secure EAD's claims for compensatory damages arising out of WMS' breaches of the Lending Agreement and related tortious conduct. Katsiris Decl. ¶ 7.

The Swiss Attachment Order Application asserted two legal grounds for an attachment order: (1) WMS, through Toros, has already dissipated the Collateral Shares in violation of the Lending Agreement, and there is a risk that further assets will be dissipated to frustrate EAD's efforts to collect damages (*id.*, Ex. 5, ¶¶ 14, 139-143) (the "Dissipation Ground"), and (2) EAD's attachment claim has a sufficient connection to Switzerland because, among other things, the Collateral Account was established at Credit Suisse in Switzerland, and the Credit Suisse employees who arranged the liquidation of the Collateral Shares were based in Switzerland (*id.* ¶¶ 15, 144-159) (the "Sufficient Connection Ground"). *See* Katsiris Decl. ¶ 8.

---

[2] The Zurich District Court is a civil court of general jurisdiction in Switzerland. *Id.*

On September 18, 2025, the Zurich District Court granted the Swiss Attachment Order Application on an interim basis.  *See id.* ¶ 9, Ex. 6 (the "Attachment Order").  The Attachment Order froze WMS' assets based on the Sufficient Connection Ground, and the order did not address the Dissipation Ground.  *Id.* ("Reason for attachment").  WMS filed its objection to the Attachment Order, but WMS's objection has not yet been disclosed to EAD.  Katsiris Decl. ¶ 10.  The Zurich District Court may rule on EAD's attachment application without disclosing WMS's objection to EAD.  *Id.*

At present, written briefing before the Zurich District Court on EAD's attachment application has concluded, and the Zurich District Court will ordinarily proceed to render a final judgment on the attachment based on EAD's and WMS's existing submissions.  *Id.* ¶ 12, n.1.[3] Absent a second exchange of briefs, the Zurich District Court is expected to issue a final judgment on the attachment application around March 2026.  *Id.* ¶ 13.

Once the Zurich District Court issues a final judgment on the attachment application, the unsuccessful party will have ten days to file an appeal to the Zurich High Court, the appellate court that presides over appeals from the Zurich District Court.  *Id.* ¶ 14. The Zurich High Court has the authority to review issues of fact and law, and the parties have limited rights to introduce new documentary evidence (*i.e.*, documentary evidence that was not submitted in support of the attachment application before the Zurich District Court).  *Id.* ¶¶ 14-15.  If the Zurich District Court's judgment is appealed by either party to the Zurich High Court – which is likely given the magnitude of the underlying dispute and the fact that WMS has filed an objection – the appellate court can consider new documentary evidence only if it is introduced prior to the conclusion of the

---

[3] EAD has the right to request a second exchange of written briefs, and if the Zurich District Court grants this request, EAD and WMS may submit further documentary evidence relating to EAD's attachment application.  *Id.*

appeal. *Id.* ¶ 15. EAD will therefore likely need to submit evidence to the Zurich High Court relating to the Dissipation Ground, the Sufficient Connection Ground (*id.* ¶ 16), or both – but EAD will only be able to do so if this Application is granted. *Id.* ¶ 18. In contrast to the Custodians, who will experience no prejudice (and only minimal burden) by disclosing the discrete categories of information requested in this Application, if the Application is *not* granted, it will prejudice EAD's ability to prosecute the Swiss Action. *Id.*

## III.    THE REQUESTED DISCOVERY

This Application seeks narrowly tailored discovery from the Custodians, for use in the Swiss Action, relating to the Custodians' involvement in transactions concerning the Collateral Shares. *See* Katsiris Decl. Exs. 2-4 (Subpoenas to the Custodians). Each of the Custodians either hosted or otherwise had access to the accounts where the unauthorized trading activities occurred. Katsiris Decl. ¶ 25; Ex. 5 ¶¶ 51-52, 84; *see also* Rezk Decl. ¶ 4.

*Credit Suisse USA*. The Collateral Shares pledged by Rezk were held in a Credit Suisse account, and the unauthorized trading activity ostensibly took place in that Credit Suisse account. *See id.* ¶¶ 9-10, 14, 16, 22-23, 27, 36, 42. The Collateral Account was established by Credit Suisse in Geneva, but the Aeva shares could not be held by Credit Suisse in Switzerland because a Swiss bank cannot be a direct owner of shares traded on a U.S.-based stock exchange, such as the Aeva shares. *See* Katsiris Decl. ¶ 27, Ex. 5 ¶¶ 51-52. Although Credit Suisse arranged for BBH to serve as local custodian of the Aeva shares in the United States, EAD needs information relating to the involvement of Credit Suisse USA in the liquidation of Aeva stock. *See* Katsiris Decl. ¶ 27. Specifically, publicly available data shows that Credit Suissa USA's trading activity in Aeva shares spiked when Rezk pledged his Collateral Shares in July and September 2022. *See* Rezk Decl. ¶ 42, Ex. 17. Moreover, almost all of the account statements for the Credit Suisse Collateral Account that Rezk received from Toros' representative appear to be doctored or fabricated. *See*

Rezk Decl. ¶¶ 18, 23, 27, Exs. 7, 10, 14.  The requested discovery will shed light on Credit Suisse USA's involvement as the U.S.-based broker-dealer which facilitated the unauthorized trades at the direction of Credit Suisse in Geneva and also communicated with BBH and Citibank regarding the Collateral Shares.  Katsiris Decl. ¶ 28; *see also* Ex. 2 (Subpoena to Credit Suisse USA).

*BBH*.  BBH was the U.S.-based custodian of the Collateral Shares that Rezk pledged in July and September 2022.  *See* Rezk Decl. ¶¶ 15, 34, 37, 41, Ex. 9; *see also* Katsiris Decl. ¶ 29, Ex. 5 ¶¶ 51-52, 121.  Publicly available trading data shows that BBH's Aeva stock holdings were gradually sold off from June 2022 until December 2022.  Rezk Decl. ¶¶ 40-41.  Discovery is needed from BBH to understand the trading instructions it received with respect to the Collateral Shares and the recipient of the liquidated Collateral Shares.  Katsiris Decl. ¶ 30; *see also* Ex. 3 (Subpoena to BBH).

*Citibank*.  Citibank was the U.S.-based custodian of the additional Aeva shares that EAD pledged in May 2023.  Rezk Decl. ¶¶ 26, 34, 43, Ex. 9; *see also* Katsiris Decl. ¶ 31, Ex. 5 ¶¶ 84-85.  Publicly available trading data shows that the Aeva stock that EAD transferred to Citibank in May 2023 was liquidated within six months of EAD's pledge.  Rezk Decl. ¶ 43, Ex. 16.  As with BBH, discovery is needed from Citibank to establish the trading instructions it received with respect to the Collateral Shares and the recipient of the liquidated Collateral Shares.  Katsiris Decl. ¶ 32; *see also* Ex. 4 (Subpoena to Citibank).

The requested discovery is directly relevant to EAD's claims in the Swiss Action.  For EAD to effectively prosecute the Swiss Action, it needs evidence relating to the Dissipation Ground and the Sufficient Connection Ground to support the attachment of WMS' assets.  Katsiris Decl. ¶ 33.  The requested documents are relevant to the Dissipation Ground (*i.e.*, that WMS has already dissipated the Collateral Shares and there is a risk that further assets will be dissipated to

frustrate EAD's efforts to collect damages), because they will shed light on the dissipation of the Collateral Shares, the persons and entities involved in the dissipation of the Collateral Shares, and the risk of further dissipation of WMS's assets. *Id.* The requested documents are also relevant to the Sufficient Connection Ground (*i.e.*, that EAD's attachment claim has a sufficient connection to Switzerland), because they may shed light on the connection between Switzerland and the relevant trading activities (*e.g.*, that the liquidation of the Collateral Shares was done at the instruction of persons or entities based in Switzerland). *Id.* EAD will have an opportunity to submit the requested information to the Zurich High Court in the highly likely event of an appeal from the Zurich District Court's final judgment, but only if the evidence is introduced immediately. *Id.* ¶¶ 15, 18. No discovery has been sought from the Custodians or their affiliates in the Swiss Action. Katsiris Decl. ¶ 25.

## ARGUMENT

The discovery sought by EAD is precisely the type of discovery contemplated by Section 1782, which authorizes federal district courts, "upon the application of any interested person," to order discovery of a "person [who] resides or is found" in the district "for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a). If an application for Section 1782 discovery meets the statutory requirements, the district court must then consider the four discretionary factors "that bear consideration in ruling on a [Section 1782] request," articulated by the United States Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-65 (2004). The Court should grant EAD's *ex parte* Application because it satisfies all of the statutory requirements of Section 1782, and each of the discretionary factors set forth by the *Intel* Court weigh in favor of granting the requested discovery.

## I.    THE APPLICATION SHOULD BE GRANTED BECAUSE IT SATISFIES ALL OF THE STATUTORY REQUIREMENTS OF SECTION 1782

Section 1782, titled "Assistance to foreign and international tribunals and to litigants before such tribunals," states in pertinent part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal …. The order may be made … upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

28 U.S.C. § 1782(a).

Section 1782 encompasses two primary aims: "'[(1)] providing efficient means of assistance to participants in international litigation in [U.S.] federal courts and [(2)] encouraging foreign countries by example to provide similar means of assistance to [U.S.] courts.'" *In re Catalyst Managerial Servs., DMCC*, 680 F. App'x 37, 38 (2d Cir. 2017) (citation omitted); *see also Intel*, 542 U.S. at 247 ("Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals."). In furtherance of these aims, "the statute has, over the years, been given 'increasingly broad applicability.'" *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012) (citations omitted).

An application made pursuant to Section 1782 must satisfy three statutory requirements: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *Id.*, 673 F.3d at 80.

EAD's discovery requests satisfy all of the statutory requirements of Section 1782.

***First***, each of the Custodians "reside[] or [are] found" in the Southern District of New York.  Each of the Custodians are headquartered in New York City and maintain significant business operations in New York City.  *See* Katsiris Decl. ¶¶ 22-24.  Credit Suisse USA maintains a principal place of business in New York, New York, and is headquartered at 11 Madison Avenue, New York, New York 10010.  *See id.* ¶ 22; Ex. 8 at 1.  BBH is a domestic limited private partnership organized under the laws of the State of New York, with its principal place of business in New York, New York, and headquarters at 140 Broadway, New York, New York 10005.  *See* Katsiris Decl. ¶ 23; Ex. 10 at 1.  Citibank is a national banking association incorporated under the laws of the United States, with a principal place of business in New York, New York, and headquarters at 388 Greenwich Street, New York, New York 10013.  *See* Katsiris Decl. ¶ 24; Ex. 11 at 1.  The Custodians' contacts with New York therefore easily satisfy the first statutory requirement of Section 1782.  *See In re W. Afr. Min. Trading Ltd.*, No. 24-mc-114 (DEH), 2024 WL 3862293, at *2 (S.D.N.Y. Aug. 19, 2024) (granting Section 1782 application and finding that several financial institutions, including Citibank and UBS, are "found" or "reside[]" in the district because they are "headquartered and/or have their principal place of business in New York."); *In In re Aso*, No. 19-mc-190 (JGK) (JLC), 2019 WL 2345443, at *3-4 (S.D.N.Y. Jun. 3, 2019) (granting application in part for entities headquartered in Manhattan because they reside or are found in the district).

***Second***, the requested discovery is "for use in" the Swiss Action (*see* Katsiris Decl. ¶¶ 25-33), which constitutes a "proceeding in a foreign or international tribunal" within the meaning of Section 1782.  The Swiss Action is pending before the Zurich District Court, a civil court of general jurisdiction in Switzerland (*id.* ¶ 5), and any appeal from a final judgment of the Zurich District Court will be considered by the Zurich High Court. *Id.* ¶ 14. The term "foreign tribunal" includes

"conventional civil, commercial, criminal, and administrative courts." *Intel*, 542 U.S. at 258. Indeed, Courts in this District have repeatedly found that Swiss courts constitute "foreign or international tribunal[s]" under Section 1782. *See, e.g.*, *In re Nike Shipholding Corp.*, No. 23-mc-221 (ALC) (KHP), 2023 WL 5917196 (S.D.N.Y. Jul. 31, 2023) (granting Section 1782 application for discovery to be used in a Swiss court, which constituted a "foreign or international tribunal"); *see also In re Top Matrix Holdings Ltd.*, No. 18-mc-465 (ER), 2020 WL 248716, at *4 (S.D.N.Y. Jan. 16, 2020) ("Swiss courts have consistently been considered to be sufficiently adjudicative to meet the Section 1782 'tribunal' requirement.") (citation omitted).

The "for use" requirement is "afforded a broad interpretation … and … may be satisfied so long as the materials sought are 'to be used at some stage of a foreign proceeding.'" *In re Kingstown Partners Master Ltd.*, No. 21-mc-691 (LTS), 2022 WL 1081333, at *5 (S.D.N.Y. Apr. 8, 2022) (citations omitted).  EAD is not required to show that the information sought would be discoverable or admissible in the foreign proceeding. *Brandi-Dohrn*, 673 F.3d at 82 ("[A]s a district court should not consider the *discoverability* of the evidence in the foreign proceeding, it should not consider the *admissibility* of evidence in the foreign proceeding in ruling on a section 1782 application.") (emphasis in original).  Rather, EAD need only show that it has the "practical ability… to place a beneficial document—or the information it contains—before a foreign tribunal." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 131-2 (2d Cir. 2017).

Here, EAD plainly satisfies the "for use" requirement.  The information sought in the Subpoenas is highly material to the Swiss Action because it directly relates to the liquidation of the Collateral Shares, which is the crux of EAD's attachment application in the Swiss Action. Katsiris Decl. ¶¶ 25-33.  The Custodians were directly involved in the unauthorized liquidation of the Collateral Shares, because they either hosted or otherwise had access to the accounts where the

unauthorized trading activities occurred. *See id.* ¶¶ 25, 27-32, Ex. 5 ¶¶ 51-52, 84. The Subpoenas seek narrowly tailored information pertaining to the Custodians' involvement in the unauthorized trading activities, including the opening and closing of the relevant accounts, authorizations with respect to those accounts, trading instructions, transaction information, account statements, and related documents and communications. *See id.* ¶ 26, Exs. 2-4 (Subpoenas). Among other things, the requested information may shed light on the precise instructions the Custodians received from WMS, how Toros and WMS characterized EAD's rights with respect to the pledged Aeva stock, and the identity of the recipients of the liquidated Aeva stock. EAD is not required, at this stage, to specify exactly how the requested discovery will be used in the Swiss Action; rather, EAD is only required to show that the requested discovery is "something that will be employed with some advantage or serve some use in the proceeding." *In re Accent Delight Int'l Ltd.*, 869 F.3d at 132 (petitioner satisfied the "for use" requirement under Section 1782).

The requested information is germane to the two grounds supporting EAD's attachment application. *See* Katsiris Decl. ¶ 33. In support of the Dissipation Ground, the requested documents will shed light on the dissipation of the Collateral Shares, the persons and entities involved in the dissipation of the Collateral Shares, and the risk of further dissipation of WMS' assets. *Id.* In support of the Sufficient Connection Ground, the documents may also shed light on the connection between Switzerland and the unauthorized trading activities. *Id.*

EAD will be able to submit the requested information to the Zurich High Court in the highly likely event of an appeal from the Zurich District Court's final judgment. *Id.* ¶¶ 15, 18, 33. The fact that appellate proceedings have not been commenced in the Zurich High Court at the time of the Application is immaterial, because the appeal is an anticipated proceeding in the Swiss Action. *Id.* ¶ 19; *see also Mees v. Buiter*, 793 F.3d 291, 301 (2d. Cir. 2015) (applicant satisfied

Section 1782's "for use" requirement by showing that the requested materials will be used "at some stage of a foreign proceeding that was within reasonable contemplation" at the time of the application); *In re Mutabagani*, No. 22-mc-299 (VB), 2023 WL 2811621, at *3-4 (S.D.N.Y. Apr. 6, 2023) (same); *In re Application of Evenstar Master Fund SPC*, No. 20-mc-418 (CS) (JCM), 2021 WL 5498283, at *2-5 (S.D.N.Y. Nov. 23, 2021) (same).

*Third*, EAD is an "interested person" within the ambit of Section 1782 because it is the petitioner in the Swiss Action. EAD has a clear interest in the Swiss Action and, by extension, the evidence available for use therein. *See In re Esses*, 101 F.3d 873, 875 (2d Cir. 1996) (finding that the language of Section 1782 and legislative history are clear that being a party to a foreign proceeding satisfies the "interested person" requirement); *see also Intel*, 542 U.S. at 256 (there is "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782.").

In light of the foregoing, this Court may order discovery from the Custodians because the Application satisfies all of the statutory requirements of Section 1782.

## II. DISCRETIONARY CONSIDERATIONS WEIGH HEAVILY IN FAVOR OF GRANTING THE APPLICATION

Where, as here, the statutory requirements of Section 1782 are met, the Court "may order" the requested discovery. 28 U.S.C. § 1782(a). In *Intel*, the U.S. Supreme Court enumerated several discretionary factors that "bear consideration in ruling on a § 1782(a) request":

> (1) whether the persons from whom the discovery is being sought are participants in the foreign proceeding;
>
> (2) the nature and character of the foreign proceeding and the receptivity of the foreign tribunal to U.S. federal court judicial assistance;
>
> (3) whether the request is an attempt to circumvent foreign proof gathering restrictions; and

(4) whether the discovery sought is unduly burdensome.

*Intel*, 542 U.S. at 264-6; *see also Brandi-Dohrn*, 673 F.3d at 80-81 (citing *Intel* factors). Here, all of the discretionary factors weigh heavily in favor of granting the Application.

**First**, the Custodians are not parties to the Swiss Action, nor are they expected to become parties to that action. Katsiris Decl. ¶ 25. In *Intel*, the Supreme Court found that assistance under Section 1782 is particularly warranted where the discovery is sought from parties that are not participants in the international proceeding. *Intel*, 542 U.S. at 264 ("[N]onparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid"); *see also Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*, 785 F. Supp. 2d 434, 437 (S.D.N.Y. 2011) ("[T]here is a greater need for § 1782 aid when the respondent is a non-participant 'because a foreign tribunal has jurisdiction over those appearing before it and can itself order them to produce evidence.'") (citation omitted). Because the Custodians are not parties to the Swiss Action, EAD must rely on the discovery sought in the Subpoenas to obtain information from the Custodians relating to the unauthorized trading activities.

**Second**, in the Swiss Action, the Zurich District Court and Zurich High Court would be receptive to information requested in the Subpoenas. There is a strong presumption that a foreign tribunal will be receptive to evidence obtained in the United States under Section 1782. *Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995) (holding that "[a]bsent specific directions to the contrary from a foreign forum, [Section 1782's] underlying policy should generally prompt district courts to provide some form of discovery assistance."). A court should deny discovery on the basis of lack of receptiveness **only** where it is provided with "*authoritative*

*proof* that [the] foreign tribunal would reject evidence obtained with the aid of section 1782." *Id.* at 1100 (emphasis added).[4]

Here, there is no indication that the Swiss courts would not be receptive to the evidence sought in the Subpoenas. To the contrary, there is nothing to prohibit Swiss courts from receiving the information sought in the Subpoenas. Katsiris Decl. ¶ 17 ("[t]he use of evidence obtained under Section 1782 does not violate any substantive or procedural public policy of Switzerland."). Provided the requested discovery is obtained in a timely manner, EAD will have the opportunity to present that documentary evidence in the Swiss Action before the Zurich High Court in the likely event of an appeal from the Zurich District Court's final judgment. *Id.* at ¶¶ 15, 18, 33.

**Third**, for the same reasons, EAD is not attempting to circumvent the applicable proof-gathering limitations in the Swiss Action. The present Application is a transparent, good faith attempt to find evidence relating to the unauthorized dissipation of tens of millions of dollars' worth of Aeva stock. And, this Application is made after EAD attempted to obtain the information from the Custodians voluntarily (and was unable to do so). Rezk Decl. ¶¶ 35-38. There is no rule or law applicable to the Swiss Action that would foreclose the gathering of evidence relating to the Custodians' involvement in the unauthorized dissipation of the Collateral Shares. *See* Katsiris

---

[4] Courts have also determined that the receptivity of a foreign court to U.S. federal judicial assistance may be inferred from the existence of treaties that facilitate cooperation between the U.S. federal judiciary and the foreign jurisdiction. *See In re Servicio Pan Americano de Proteccion*, 354 F. Supp.2d 269, 274 (S.D.N.Y. Dec. 6, 2004) (foreign jurisdiction "has indicated its receptivity to federal judicial assistance by its signature of treaties facilitating such cooperation"); *In re Application of Imanagement Serv*s. Ltd., No. Civ.A 05-2311 (JAG), 2006 WL 547949, at *4 (D.N.J. Mar. 3, 2006) (same). Switzerland has entered into such treaties with the United States. *See* Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters (also known as the Hague Evidence Convention) (United States and Switzerland have both signed and ratified the convention); U.S.-Switzerland Treaty on Mutual Legal Assistance in Criminal Matters, entered into force January 23, 1977. 27 U.S.T. 2019, T.I.A.S. 8302.

Decl. ¶ 17.  In fact, documents "obtained through Section 1782 discovery in the U.S. are ordinarily admissible in Swiss legal proceedings, provided they are introduced in those proceedings in accordance with the applicable Swiss evidentiary rules."  *Id.*[5]

No discovery has been sought from the Custodians or their affiliates in the Swiss Action (Katsiris Decl. ¶ 25), but this does not weigh against the Application.  Section 1782 does not impose any requirement for EAD to exhaust its remedies in the foreign action before seeking Section 1782 discovery.  *Mees*, 793 F.3d at 303; *see also In re Aso*, 2019 WL 2345443, at *7 (Section 1782 "does not contain an exhaustion requirement that would impose upon an applicant a duty to first seek the requested discovery from the foreign court.").

**Fourth**, the discovery sought is not unduly burdensome.  EAD only seeks information that is directly relevant to the Collateral Shares, and the Collateral Account where the unauthorized trading activity took place.  Katsiris Decl. ¶ 26.  Liquidation of the Collateral Shares is at the crux of the Swiss Action (*see id.*, Ex. 5 ¶ 2), and the Subpoenas are narrowly tailored to obtain information from the Custodians that relates **only** to the Collateral Account and the unauthorized trading of the Collateral Shares.  *See id.* ¶¶ 26, 28, 30, 32; Exs. 2-4 (identifying limited categories of documents requested from the Custodians).  This information will be critically important to EAD's claims in the Swiss Action, for the reasons described *supra* at 15-16.  The burden placed on the Custodians is certainly reasonable (and likely minimal), as the requested information should be readily available in electronic files, the Custodians are large financial institutions with ample resources available to respond to the Subpoenas, and any incidental burden is outweighed by the

---

[5] The third discretionary *Intel* factor does not require this Court to consider the applicable Swiss evidentiary rules in order to grant the requested discovery. *See, e.g.*, *Brandi-Dohrn*, 673 F.3d at 82 (affirming that Section 1782 does not require that the evidence requested be admissible or discoverable in the foreign tribunal); *see also Mees*, 793 F.3d at 303 (Section 1782 "contains no foreign-discoverability requirement.").

importance of the requested information to the Swiss Action. *See In re Tuohy*, No. 24-mc-605 (GHW) (OTW), 2025 WL 1147574, at *4 (S.D.N.Y. Apr. 18, 2025) (Section 1782 subpoenas were not unduly burdensome where they sought documents that three financial institutions "would be expected to maintain in the ordinary course of business."); *see also In re Rodriguez Gallen*, No. 20-mc-102 (ALC), 2020 WL 114683, at *3 (S.D.N.Y. Jun. 29, 2020) (a third-party bank "should be able to search for and produce" certain financial records "without significant burden.").

Therefore, each discretionary factor identified by the *Intel* Court weighs in favor of granting the Application.

## III.    THE APPLICATION SHOULD BE GRANTED ON AN *EX PARTE* BASIS

This Court should grant the Application on an *ex parte* basis. District courts may, and indeed typically do, grant Section 1782 applications on an *ex parte* basis. *See, e.g., Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) ("[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*"); *In re Hornbeam*, 722 F. App'x 7 (2d Cir. 2018) (same); *In re O'Keeffe*, 650 F. App'x 83, 85 (2d Cir. 2016) (rejecting discovery target's contention that it was "impermissible or improper for [applicant] to bring her application *ex parte*"). The Custodians will not be prejudiced by an order granting the Application on an *ex parte* basis, because they will still have the right to challenge the Subpoenas after they are issued, if they feel a need to do so. *See Gushlak*, 486 F. App'x at 217 (respondent's "due process rights are not violated [by an *ex parte* Section 1782 application] because he can later challenge any discovery request…."). In addition, if the Application is granted, EAD intends to work with counsel for each of the Custodians to obtain the requested information in the most efficient possible manner for all concerned. By contrast, if this Application is denied, EAD will be highly prejudiced, as its ability to submit the requested information in the Swiss Action would in that event be foreclosed.

## **CONCLUSION**

For the foregoing reasons, EAD respectfully requests that the Court grant its *ex parte*

Application for an Order under Section 1782 to obtain discovery from the Custodians, and grant

EAD leave to serve the subpoenas attached as Exhibits 2-4 to the Katsiris Declaration.

Dated: New York, New York             Respectfully submitted,
       November 26, 2025

                                 **VENABLE LLP**

                                By:   */s/Kostas D. Katsiris*
                                     Kostas D. Katsiris
                                     KDKatsiris@Venable.com
                                     Benjamin S. Paull
                                     BSPaull@Venable.com

                                     151 West 42nd Street
                                     New York, New York 10036
                                     (212) 307-5500

                                   *Counsel for Applicant EAD Group LLC*

## **CERTIFICATE OF COMPLIANCE**

This memorandum of law complies with Local Civil Rule 7.1(c) of the Local Rules for the United States District Court for the Southern and Eastern District of New York because it contains 6,651 words.  It also complies with typeface, margin, and spacing requirements of Local Civil Rule 7.1(b) because the text is 12-point type, and the memorandum has one-inch margins on all sides and is double-spaced.

By: */s/Kostas D. Katsiris*
Kostas D. Katsiris
